24 P.3d 390 (2001)
143 Wash.2d 687
John DOE, Petitioner,
v.
GONZAGA UNIVERSITY, a Washington nonprofit corporation, Julia M. Lynch, Roberta S. League, and Susan J. Kyle, Respondents.
No. 69456-7.
Supreme Court of Washington, En Banc.
Argued January 18, 2001.
Decided May 31, 2001.
*392 Randall & Danskin, Laurel Hobbs Siddoway, George M. Ahrend, David Groesbeck, Spokane, WA, for Petitioner.
Wiggins Law Office, Charles Kenneth Wiggins, Kenneth Wendell Masters, Bainbridge Island, WA, for Respondent.
Christine Gregoire, Attorney General, Warren Howard Fischer, Jr., Asst., Olympia, WA, for amicus curiae on behalf of Superintendent of Public Instruction.
*393 Davis, Wright, Tremaine, Bruce Edward Humble Johnson, Eric Stahl, Diana C. Tate, Seattle, WA, for amicus curiae on behalf of Association of Washington Business.
*391 IRELAND, J.
Petitioner John Doe sought review of a Court of Appeals' decision reversing the jury's award of damages (based on claims of defamation, negligence, invasion of privacy, violation of his rights under the Family Educational Rights and Privacy Act of 1974 (FERPA), and breach of contract) and remanding the case for retrial solely on the defamation claim.
We hold that the jury was properly instructed and that there is substantial evidence to sustain the jury's verdict on the defamation, invasion of privacy, violation of FERPA, and breach of contract claims. Because Gonzaga had no duty to investigate allegations against John Doe, there is no cognizable claim for negligence. Therefore, the Court of Appeals' decision is affirmed in part and reversed in part. The case is remanded to reinstate the judgment on all claims except negligence, which is to be dismissed.

FACTS
The witnesses presented widely divergent accounts of the facts in this case.
In late 1992, while John Doe was an elementary education student at Gonzaga University (Gonzaga), he had a sexually intimate relationship with Jane Doe, a student who was studying special education at Gonzaga.[1]
In October 1993, Roberta League (League), Gonzaga's teacher certification specialist, overheard student Julia Lynch (Lynch) talking with another student about Lynch's dissatisfaction with the way the school dealt with complaints of date rape. Lynch said that when she had been a resident assistant, she had observed Jane Doe in obvious physical pain, which Jane Doe said was the result of having sex with "John." Lynch was angry that no one from Gonzaga had bothered to find out what had happened.
League recognized the name "John"; she knew John Doe was a student teacher in the education program at Gonzaga. Two days later, League told Dr. Susan Kyle (Kyle), Gonzaga's director of field experience for student teachers, what she had overheard. Kyle and League decided that they needed to investigate the situation.[2] League was concerned that the allegations she had overheard about John Doe might affect the dean's ability to submit an affidavit supporting John Doe's application for teacher certification.[3]
The two women met with Lynch on October 14, 1993. According to Lynch, Jane Doe told Lynch that John Doe had sexually assaulted her three times in late November or December 1992. Lynch also said that she accompanied Jane Doe to the student health center soon after the last assault, and the nurse concluded that Jane Doe had been date *394 raped.[4] According to League and Kyle, Lynch said that Jane Doe claimed John Doe verbally coerced her into participating in "aberrant sexual behavior" with "other objects besides his penis," and urged Jane Doe to engage in multiple partner sex.[5] Clerk's Papers (CP) at 98, 195.
At the conclusion of the meeting, League and Kyle asked Lynch to see if Jane Doe would speak with them about her relationship with John Doe. Lynch did, and Jane Doe became angry and told Lynch that she did not want to make a complaint. Lynch told Kyle and League of Jane Doe's response.
League also contacted Adelle Nore, an investigator for the Office of the Superintendent of Public Instruction (OSPI), the state agency which certifies teachers. League and other Gonzaga personnel spoke with Nore by telephone numerous times about the allegations of John Doe's sexual misconduct, and League identified John Doe to Nore by name.
Nore testified that she believed Gonzaga personnel needed to speak with both John Doe and Jane Doe about the allegations. However, Gonzaga personnel did not ask her for her advice and did not tell Nore that they had not talked to John Doe. It was Nore's understanding in her conversations with League and Kyle that the alleged victim was credible and prepared to make a statement.
On October 28, 1993, Kyle met with Jane Doe, and told her about the date rape allegations. During the meeting, Jane Doe stated, "I guess I don't really know what rape is," and "I promised [John] I wouldn't tell." CP at 99. Jane Doe refused to make a formal statement.
After leaving Kyle's office, Jane Doe talked with Professor William Sweeney (Sweeney), who later described her as near hysteria and weeping uncontrollably. Sweeney testified that Jane Doe told him that John Doe had sexually assaulted her on three occasions, each time more violent and abusive, and that she screamed and tried to get away. According to Sweeney, Jane Doe also said that John Doe repeatedly threatened her life, and that she did not believe the university could protect her from him.[6]
In January 1994, Jane Doe asked Janet Burcalow (Burcalow), chair of the department of teacher education, not to pursue the matter. But according to Burcalow, Jane Doe would not say that nothing happened, and Jane Doe admitted being afraid that John Doe would be angry if he found out she had talked about their relationship. Jane Doe testified that Burcalow told her that Burcalow already knew something bad had happened. Jane Doe told Burcalow these things were not true. Then Burcalow shook a finger at Jane Doe and asked her if she knew "where people who lie go." CP at 1886, 1925.
*395 Cheryl Lepper, an instructor in the teacher education department, testified at trial that Jane Doe told her in the spring of 1993 that John Doe had forced Jane Doe to have sexual intercourse with him. According to Lepper, Jane Doe said John Doe had restrained her, forced her to have sex, and had then stalked her after she broke up with him.
In February 1994, Dr. Corrine McGuigan (McGuigan), dean of the school of education, met with League, Kyle, Burcalow, and Sweeney. McGuigan obtained written summaries of the narratives they presented to her, and later concluded that there was sufficient evidence of a serious behavioral problem to preclude her from signing the moral character affidavit supporting John Doe's application for teacher certification.[7]
John Doe first learned about Gonzaga's investigation of him on March 4, 1994, the same day he made his final payment of fees and tuition to Gonzaga. John Doe received a call asking him to come to McGuigan's office. He was escorted to a private room and left to read a letter from McGuigan. The letter explained that in light of allegations of sexual assault, McGuigan would not give John Doe the moral character affidavit required to support his application for certification to teach. McGuigan refused to tell John Doe who had made the allegations against him. Testimony was also presented that when John Doe and his parents asked about their appeal rights, they were told there were none.
By the time of trial, Jane Doe had married and was attending graduate school in another state. Because she was unavailable, John Doe presented her testimony through portions of a 1997 videotaped deposition, which were shown to the jury. In both the videotaped deposition and a 1995 deposition, Jane Doe denied that John Doe had sexually assaulted her. She denied that she had made many of the statements that Gonzaga personnel attributed to her. She testified that Lynch had "really blown things out of proportion," and that there were falsehoods in the declarations of Kyle, Burcalow, and Sweeney. Report of Proceedings (RP) at 877. Jane Doe denied speaking about personal matters to Lepper. She testified that she had tried to dissuade Kyle and Burcalow from pursuing the allegations. Jane Doe felt that Burcalow "wasn't interested in hearing anything other than what she already believed." CP at 1887. Jane Doe told McGuigan that Gonzaga personnel were "wrong in their assumptions" about what had happened in her relationship with John Doe. Id. She testified that some of the things that happened in her sexual relationship with John Doe made her uncomfortable.
John Doe testified that he and Jane Doe had sexual intercourse on five occasions. He said he stopped when she seemed uncomfortable, and she never asked him to stop. John Doe presented the testimony of roommates that they never saw or heard any indication that Jane Doe was unwilling to engage in sexual intercourse. He presented the testimony of two former girl friends that John Doe never pressured them to engage in sexual activity, never tried to talk them into sexual activity uncomfortable to them, and never criticized them for not engaging in sex. John Doe testified that he found "a lot of lies" when he read the declarations of League, Kyle, Burcalow, and Sweeney. RP at 449. The declarations made him disgusted and angry. John Doe said that Gonzaga destroyed his career in teaching, his goals, and his dreams.

PROCEDURAL HISTORY
In June 1994, John Doe brought an action against Jane Doe and Gonzaga. John Doe sued Jane Doe for falsely accusing him of sexual assault or rape; he sued Gonzaga for republishing the accusations "both between and among staff and faculty of Gonzaga and by reporting the same to the Office of the Superintendent of Public Instruction." CP at 13. John Doe sought to recover from Gonzaga for defamation, negligence, and breach of educational contract. He also brought a separate action against Lynch, League, and Kyle, individually, and the two actions were consolidated by stipulation.
*396 Jane Doe cross-claimed against Gonzaga, alleging defamation and negligent investigation. She counterclaimed against John Doe for sexually assaulting her. John Doe and Jane Doe agreed to dismiss their claims against each other in September 1996.
Jane Doe later filed a notice of dismissal of her claims against Gonzaga, leaving only John Doe's claims against Gonzaga and its employees for trial. John Doe's amended complaint asserted claims for defamation, intrusion into his private affairs, and a 42 U.S.C. § 1983 claim for violation of 20 U.S.C. § 1232g(b) (FERPA) against all parties, and claims for negligence and breach of educational contract against Gonzaga.
Following a trial held in Spokane County Superior Court between March 17 and April 1, 1997, the jury returned a verdict in John Doe's favor, awarding him damages as follows:

Defamation $ 500,000
Breach of Educational Contract 55,000
Negligence 50,000
Invasion of Privacy 100,000
Violation of "FERPA" Rights 150,000
Punitive Damages for FERPA
 Violation 300,000
 __________
 TOTAL $1,155,000

The trial court entered judgment on the verdict and also awarded John Doe attorney fees and costs under 42 U.S.C. § 1988.
Gonzaga appealed to the Court of Appeals, seeking review of the judgment and the trial court's rulings denying Gonzaga's posttrial motions and awarding attorney fees to the plaintiff. John Doe cross-appealed, seeking review of the trial court's order denying his motion for CR 26(g) sanctions. By order of the Court of Appeals, the matter was transferred from Division Three to Division One.
The Court of Appeals reversed the negligence, invasion of privacy, 42 U.S.C. § 1983, and breach of contract awards and remanded for a new trial on the defamation claim. The appellate court also held that the trial court abused its discretion in failing to impose CR 26(g) sanctions against Gonzaga for discovery abuse. The trial court was ordered "to impose an appropriate sanction on remand." Doe v. Gonzaga Univ., 99 Wash.App. 338, 361, 992 P.2d 545 (2000).
This Court granted John Doe's petition for review of the Court of Appeals' decision. Doe v. Gonzaga Univ., 141 Wash.2d 1023, 10 P.3d 1075 (2000).

ANALYSIS
Standard of Review
Questions of law are reviewed de novo. Mountain Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994). Factual findings are reviewed under the substantial evidence standard: "The record must contain a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the premise in question." Canron, Inc. v. Fed. Ins. Co., 82 Wash.App. 480, 486, 918 P.2d 937 (1996).
An appellate court may overturn a jury's verdict only if the verdict is "clearly unsupported by substantial evidence." Burnside v. Simpson Paper Co., 123 Wash.2d 93, 108, 864 P.2d 937 (1994). The court may not substitute its judgment for that of the jury when there is evidence that, if believed, would support the verdict rendered. Id.
A trial court's evidentiary rulings are upheld on appeal absent an abuse of discretion. Sunbreaker Condo. Ass'n v. Travelers Ins. Co., 79 Wash.App. 368, 372, 901 P.2d 1079 (1995). Abuse of discretion is "discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971).
Issues[8]
In addition to certain evidentiary and procedural questions, the primary issues in this case may be stated as follows:
*397 1. Whether Gonzaga or its employees may be held liable for defamatory statements made only among Gonzaga personnel.
2. Whether Gonzaga has a duty to exercise reasonable care in collecting information or investigating whether a candidate for certification as a teacher has a history of serious behavioral problems.
3. Whether a candidate for certification as a teacher waives his or her common law right to privacy.
4. Whether FERPA creates any right or privilege which can be enforced by individuals under 42 U.S.C. § 1983.
5. Whether statements in Gonzaga's bulletin and other publications agreeing to provide an opportunity for students to be heard in matters affecting their welfare constitute an enforceable contract with regard to Gonzaga's issuance of an affidavit for teacher certification.
1. Defamation
"In Washington, a defamation plaintiff must show four essential elements: falsity, an unprivileged communication, fault, and damages." Commodore v. Univ. Mech. Contractors, Inc., 120 Wash.2d 120, 133, 839 P.2d 314 (1992). Liability for defamation requires that the defamation be communicated to someone other than the person defamed; in other words, there must be a "publication" of the defamation. Pate v. Tyee Motor Inn, Inc., 77 Wash.2d 819, 821, 467 P.2d 301 (1970). The Court of Appeals vacated John Doe's defamation award and directed that the jury be instructed on remand that Gonzaga cannot be held liable for communications among its own employees.
More than 80 years ago, this Court held that intracorporate communications are not "published" for purposes of defamation. "For a corporation ... acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives cannot be a publication of the libel on the part of the corporation. It is but communicating with itself." Prins v. Holland-North Am. Mortgage Co., 107 Wash. 206, 208, 181 P. 680 (1919). The plaintiff there was a Seattle branch manager of a company headquartered in the Netherlands. The alleged defamation was contained in a letter sent by the main office and read only by the plaintiff's co-manager and a bookkeeper. The Prins court held that there had been no publication of the allegedly defamatory statements.
In the case before us, the Court of Appeals reasoned that, likewise, the conversations and memoranda between Gonzaga's employees regarding John Doe should be characterized as the university communicating with itselfnot the kind of "publication" required to support a defamation claim.
John Doe contends that the common interests of a corporation's employees create only a qualified privilege. "A privileged communication involves the occasion where an otherwise slanderous statement is shared with a third person who has a common interest in the subject and is reasonably entitled to know the information." Pate, 77 Wash.2d at 820-21, 467 P.2d 301. The plaintiffs in Pate were chambermaids who sued their employer and its supervisors for defamation. The alleged slander was a supervisor's statement that the plaintiffs were sneaking around joining a unionactions which amounted to Communism. The statement was made in a meeting attended by both the plaintiffs and nonunion housekeepers. The opinion noted that the supervisor had no duty to comment upon the ideology of unions in the ordinary course of her work, which took her statement outside the circumstances and principles of Prins.
Because the employees in Prins were clearly acting "within the limits of their employment," the court was not required to address the nature of any privilege on the communications among them. Prins, 107 Wash. at 208, 181 P. 680. However, when the supervisor in Pate made comments not "[i]n the ordinary course of her work," she could be held liable for publishing a defamatory statement to third persons, even though the third persons were also employees of the corporation. Pate, 77 Wash.2d at 821, 467 *398 P.2d 301. Under these cases, intracorporate communications are not absolutely privileged. When a corporate employee, not acting in the ordinary course of his or her work, publishes a defamatory statement, either to another employee or to a nonemployee, there can be liability in tort for resulting damages.
In the instant case, from the evidence presented at trial, it could reasonably be found that Julia Lynch was not acting in the ordinary course of her work as an office assistant when she told another student that John Doe had injured Jane Doe during a sexual relationship. It could also be found that Roberta League was not acting in the ordinary course of her work as a certificate specialist when she eavesdropped on Lynch's conversation and shared her concerns of possible misconduct with Susan Kyle. Likewise, it could be found that Roberta League and Susan Kyle were not acting in the ordinary course of their work when they questioned Lynch about alleged sexual assaults of Jane Doe by John Doe and then disclosed John Doe's identity and details about his sexual relations to Adelle Nore at OSPI.
The Court of Appeals reversed the trial court for refusing to give Gonzaga's proposed Prins jury instruction. However, the doctrine of Prins has been refined by Pate. The holding of Prins must be read in conjunction with the later holding of Pate. There is a qualified privilege for communications made between coemployees, but that privilege may be lost if the employees are not acting in the ordinary course of their work. The trial court's instructions fully encompassed the principles of publication and qualified privilege in a corporate context as announced in Pate. Therefore, the jury was properly instructed.
When a defendant has a qualified privilege to communicate a potentially defamatory statement, the privilege may also be lost by showing that the defendant made the statement with actual malice. Caruso v. Local Union No. 690, 107 Wash.2d 524, 530-31, 730 P.2d 1299 (1987). Actual malice exists when a statement is made "with knowledge of its falsity or with reckless disregard of its truth or falsity." Herron v. KING Broad. Co., 109 Wash.2d 514, 523, 746 P.2d 295 (1987). "To prove actual malice a party must establish that the speaker knew the statement was false, or acted with a high degree of awareness of its probable falsity, or in fact entertained serious doubts as to the statement's truth." Story v. Shelter Bay Co., 52 Wash.App. 334, 343, 760 P.2d 368 (1988).
The Court of Appeals held that the trial court's actual malice instruction was deficient because it failed to set forth the subjective nature of the reckless disregard standard. John Doe contends Gonzaga's own proposed instruction was deficient. Gonzaga's instruction reads as follows:
"Actual malice" or "lack of good faith,"when used in these instructions, means that the defendant knew that a statement was false or acted with reckless disregard as to whether a statement made was true or false. One acts with "reckless disregard for the truth or falsity of a statement" when one knows of the existence of information which would render a statement false and, nevertheless, without reasonable justification, disregards the information. The plaintiff has the burden of proving "actual malice" or "lack of good faith" by clear and convincing evidence.
CP at 1441.
The requested instruction sets forth the correct standard of proof clear and convincing evidence. However, it defines a knowingly false statement, not a statement made with recklessness. The case law cited by Gonzaga in support of its instruction tracks the language of the instruction given by the trial court. Gonzaga cannot be heard to complain.
Under Washington law, the trial court properly instructed the jury regarding the defamation claim. There was sufficient evidence for the jury to find that communications among Gonzaga personnel and statements made to OSPI were not privileged. Therefore, the jury's verdict and damage award for John Doe's defamation claim are reinstated.
2. Negligence
At trial, John Doe contended that when examining witnesses and investigating *399 the details of his private life, Gonzaga owed a duty of care to conduct its investigation reasonably.
The language of former WAC 180-75-082 (1989), repealed by St. Reg. XX-XX-XXX (Mar. 8, 1997), the administrative regulation authorizing Gonzaga to collect information regarding a teacher certification candidate's potential behavioral problems, does not impose an affirmative duty on the university to formally investigate a candidate's personal history.[9] In fact, the regulation requires only that a designated university official contact several faculty members who know or knew the applicant in order to ascertain whether they have any knowledge that the applicant has been convicted of a crime or has a history of any serious behavioral problems.
As noted by the Court of Appeals, no statute or administrative regulation applicable to this case imposed an affirmative duty on Gonzaga to investigate allegations of behavioral problems among its education students. Absent a duty to investigate, there can be no breach of duty. Although John Doe urged the courts below to imply a duty to act reasonably when Gonzaga voluntarily undertook to investigate, there is no basis to create such a duty.
Because Gonzaga had no duty to conduct an independent investigation, a claim of negligent investigation cannot be supported. The Court of Appeals properly reversed the judgment on John Doe's negligence claim, and the claim was not pursued before this Court.
3. Invasion of Privacy
"[T]he common law right of privacy exists in this state and ... individuals may bring a cause of action for invasion of that right." Reid v. Pierce County, 136 Wash.2d 195, 206, 961 P.2d 333 (1998).
The jury was properly instructed, based on Restatement (Second) of Torts § 652B (1977), concerning John Doe's claim
With respect to plaintiff's claim for "invasion of privacy," the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:
1. An intentional intrusion, physically or otherwise, upon the solitude or seclusion of plaintiff, or his private affairs;
2. With respect to the matter or affair which plaintiff claims was invaded, that plaintiff had a legitimate and reasonable expectation of privacy;
3. The intrusion would be highly offensive to a reasonable person; and
4. That the defendant's conduct was a proximate cause of damage to plaintiff.
CP at 1478.
Gonzaga asserts that there was nothing "highly offensive" about its attempts to determine the facts about John Doe's relationship with Jane Doe. However, the jury heard testimony that Gonzaga personnel had inquired into the personal relationships, habits, and even anatomy of John Doe. Although state regulation authorizes officials from a teacher certificate applicant's school to contact faculty members regarding the applicant's history of serious behavioral problems, the provision does not contemplate an investigation by nonfaculty school personnel into the intimate details of a candidate's sex life:
"Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends. Sexual relations, for example, are normally entirely private matters.... When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable man, there is an actionable invasion of his privacy...."
Cowles Publ'g. Co. v. State Patrol, 109 Wash.2d 712, 721, 748 P.2d 597 (1988) (quoting Restatement (Second) of Torts § 652D, at 386 (1977)).
The jury was presented with sufficient evidence of Gonzaga's investigative activities to determine that John Doe's privacy had been *400 invaded and that such an intrusion would be highly offensive to a reasonable person. The facts support John Doe's claim for invasion of privacy. The jury's verdict and damage award for this claim are reinstated.
4. FERPA
John Doe asserted Gonzaga's violation of his rights FERPA as the basis for his claims for damages under the Federal Civil Rights Act (42 U.S.C. § 1983). John Doe argues that Gonzaga violated FERPA by disclosing confidential information about him to OSPI.
The FERPA statute provides in pertinent part as follows:
No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents....[10]
20 U.S.C. § 1232g(b)(1).
Gonzaga's alleged violation of FERPA rights grew out of a disclosure practice developed by Gonzaga personnel and OSPI. The jury heard testimony that Gonzaga personnel routinely called OSPI, before a student's application for certification was submitted, to talk about students as to whom they had "cause for concern" and to obtain advice. Nore testified that the calls about John Doe that OSPI received from League and others were typical of conversations she had with Gonzaga personnel. In preapplication conversations, Nore would often be told the names of the student candidates. Substantial evidence supports a determination that Gonzaga had a "policy or practice" of disclosing personally identifiable information contained in education recordsin violation of FERPA.
Courts have held that FERPA itself does not give rise to a private cause of action. E.g., Fay v. S. Colonie Cent. Sch. Dist., 802 F.2d 21, 33 (2d Cir.1986). However, John Doe does not allege a private cause of action under FERPA. Instead, he asserts the FERPA violation as the basis for a claim under section 1983, which provides a remedy for violation of federally conferred rights. Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 509, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).
The Supreme Court has provided guidance on the ability of a claimant to bring a section 1983 claim premised on the violation of a federal statute. To determine whether a particular statutory provision gives rise to a federal right, a court must examine the following three factors: (1) whether Congress intended the provision in question to benefit the plaintiff; (2) whether the right protected by the statute is so "vague and amorphous" that its enforcement would strain judicial competence; and (3) whether the statute imposes a binding obligation on the states. Blessing v. Freestone, 520 U.S. 329, 329-30, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).
Applying this three-factor test favors the conclusion that the FERPA provision at issue here gives rise to a federal right enforceable under section 1983.
First, the statute is intended to benefit students. The joint statement in explanation of FERPA states:
The purpose of the Act is two-foldto assure parents of students, and students themselves if they are over the age of 18 or attending an institution o[f] post-secondary education, access to their education records and to protect such individuals' rights to privacy by limiting the transferability of their records without their consent.
120 Cong. Rec. 39,862 (1974).
Second, the right is not so "vague and amorphous" that the court cannot enforce it. *401 Courts routinely review the policies and practices of entities and individuals for statutory compliance.
Finally, the FERPA provision provides a binding obligation. If an educational institution does not require student consent before it releases educational records, "[n]o funds shall be made available under any applicable [federal educational] program." 20 U.S.C. § 1232g(b)(1).
The Court of Appeals relied on United States Supreme Court decisions regarding other federal statutes for guidance as to whether FERPA creates an enforceable individual right.[11] Reasoning by analogy from these cases, the Court of Appeals held that Gonzaga is not liable because "FERPA does not create individual rights privately enforceable under 42 U.S.C. § 1983." Doe v. Gonzaga Univ., 99 Wash.App. at 357, 992 P.2d 545. However, the Supreme Court has not ruled on FERPA, the law at issue in this case.
Federal appellate decisions which have specifically addressed FERPA have held that the statute creates rights actionable under section 1983.[12] These well-reasoned decisions, which are directly applicable to the instant case, are more persuasive than those relied upon by the Court of Appeals. In the instant case, FERPA does create individual rights privately enforceable under section 1983.
In order to prevail on a section 1983 claim, "(1) the plaintiff must show that some person deprived ... [him or her] of a federal constitutional or statutory right; and (2) that person must have been acting under color of state law." Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 11, 829 P.2d 765 (1992). As discussed above, the statutory right at issue arises under FERPA.
Section 1983 itself provides in pertinent part as follows:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.
Gonzaga argues that there was no substantial evidence that it was acting under color of state law. However, at trial, Janet Burcalow, who served for several years as the dean's designee, testified that Gonzaga acts for the State when it completes the moral affidavit for a student. Burcalow confirmed that she viewed the "Gonzaga certificate department as helping OSPI fulfill a duty that had been given to them by the legislature." RP at 829. When asked if there is a common interest between Gonzaga and OSPI, Burcalow responded, "Well, we work together on the matter of certification." RP at 861. Roberta League, Gonzaga's certification specialist, confirmed that Gonzaga is an agent of the State in the certification process. League testified about "my job in compliance with what I was supposed to do for the State of Washington for certification." RP at 759.
Whether the defendants were acting under color of state law is an issue of fact for the jury. Where there is joint action of the sort described at trial, the jury had substantial evidence to find that action under color of state law is present. See Kuehn v. Renton Sch. Dist. No. 403, 103 Wash.2d 594, 602, 694 P.2d 1078 (1985) ("`It is enough that [a *402 private person] is a willful participant in joint action with the State or its agents.'" (alteration in original) (quoting Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980))).
As an alternative justification for its reversal of the jury's verdict on John Doe's FERPA claim, the Court of Appeals acted sua sponte in holding that "even if FERPA did create individual rights enforceable under § 1983, we would nonetheless hold that a teacher candidate waives those rights when he or she applies for teacher certification." Doe v. Gonzaga Univ., 99 Wash.App. at 357, 992 P.2d 545 (emphasis added). The Court of Appeals offers no statute, case law, or public policy in support of its holding.
Waiver is the intentional and voluntary relinquishment of a known right; it may be either express or implied. Jones v. Best, 134 Wash.2d 232, 241, 950 P.2d 1 (1998). To constitute implied waiver, there must be unequivocal acts or conduct evidencing an intent to waive; intent will not be inferred from doubtful or ambiguous factors. Wagner v. Wagner, 95 Wash.2d 94, 102, 621 P.2d 1279 (1980). Under the facts of this case, no such waiver by John Doe is demonstrated. In addition, John Doe's application for teacher certification had not been submitted to OSPI when personally identifiable information about his alleged sexual misconduct was communicated by Gonzaga. The Court of Appeals' holding that teacher candidates waive their FERPA rights enforceable under section 1983 when applying for certification cannot be supported.
At trial, evidence was presented to show that personally identifiable allegations of sexual misconduct were communicated to OSPI by Gonzaga. The allegations became part of the public record. The jury was properly instructed, and substantial evidence supported its unanimous award of punitive damages to John Doe. We reinstate the jury's verdict and damage awards for John Doe's FERPA claim.
5. Breach of Contract
Gonzaga argues that John Doe never articulated a coherent breach of contract theory. However, at trial, Gonzaga's student handbook was introduced. Under the heading "Mutual Responsibility," the handbook states as follows:
The admission of a student to Gonzaga University and the student's acceptance of that admission constitute an agreement of mutual responsibility. The student's obligation is to accept the published policies of the University and to act in a manner consistent with these policies. In turn, the University's responsibility is to provide an environment in which the student's educational goals may be achieved. The University also recognizes its obligation to provide students with an opportunity to be heard in matters affecting their welfare.
RP at 335-36.
The jury received the following proper instruction concerning the breach of contract claim:
The relationship between a student and a university is primarily contractual in nature. Since a formal contract is rarely prepared, the general nature and terms of the agreement are usually implied. Specific terms can be found in the university bulletin and other publications.
Implied contracts arise by inference or implication in some act or conduct. You may find implied contract by inference or implication from circumstances which, according to the ordinary course of dealing and people's common understanding, shows a mutual intention on the part of the parties to contract with each other.
The interpretation of the terms of the contract that existed between Gonzaga and [John Doe] is for you to determine, from the university bulletin and other publications and from all of the facts and circumstances.
CP at 1471.
The jury was presented with Gonzaga's written representations concerning its agreement with its students and heard extensive testimony about the conduct of Gonzaga personnel toward John Doe. John Doe argued that Gonzaga breached its agreement by failing to discuss the sexual assault allegations with him before reaching a final decision not *403 to issue him an affidavit. John Doe testified that his long-term educational goal was to become a teacher. Sufficient evidence was presented for the jury to determine the existence, terms, and breach of a contract between Gonzaga and John Doe. The jury's verdict and damage award for John Doe's breach of contract claim are reinstated.
6. Evidentiary Issues
The trial court did not abuse its discretion in admitting four documents prepared by Gonzaga employees in anticipation of litigation or in refusing to admit the settlement agreement between John Doe and Jane Doe and the testimony of two witnesses disclosed by Gonzaga late in the trial.
7. Duplication of Damages
Gonzaga argues that the trial court judgment was excessive because the damages awarded by the jury on John Doe's claims overlap and are duplicative. The verdict form is actually structured so that the jury was required to consider each of the distinct claims for damages and to make individual determinations as to each defendant for each claim. In addition, the jury was instructed as follows:
In this case plaintiff makes five separate claims for damages. Previously in these instructions the court has instructed you as to the elements of each claim and the burden of proof applicable to each claim. If you find that Plaintiff has not met his burden of proof on a claim then you need not and should not consider the issue of damages with respect to that claim.
If, on the other hand, you find that Plaintiff has sustained his burden of proof with respect to a claim, then you should award any damage proved with respect to that claim.
CP at 1495.
Nothing in the verdict form or the jury instruction supports the argument that damages awarded on John Doe's claims overlap or are duplicative. In addition, when the verdict was entered, Gonzaga made no request for its clarification.
8. Discovery Sanctions
After document discovery and a series of depositions of Gonzaga employees in 1994, John Doe prepared a chronology of meetings and communications among Gonzaga personnel based on that discovery. He asked Gonzaga, by interrogatory, to review the document, to identify any inaccuracies, and to provide the dates and participants for any relevant meetings and communications not listed in the chronology.
Gonzaga objected to the interrogatory, asserting it was unduly burdensome and oppressive. Gonzaga answered by referring John Doe to depositions and to documents and answers to interrogatories already supplied by Gonzaga to him. Gonzaga also stated as follows: "All of the information supplied, in the aggregate, will support the accuracy or the inaccuracy of the `chronology.'" CP at 1320. By this statement, Gonzaga implied that all responsive information was contained in material already produced.
About six weeks before the 1997 trial, through an independent motion, Gonzaga was ordered to produce documents earlier withheld on the basis of the attorney-client privilege or as attorney work product. In particular, John Doe obtained a chronology prepared in 1994 by Gonzaga personnel. John Doe claims the chronology contained references to meetings and conversations that Gonzaga had not previously disclosed, requiring John Doe to re-depose two witnesses.
John Doe filed a CR 26(g) motion for sanctions. The trial court found that he suffered no ultimate harm because the document was eventually produced; therefore, the motion for sanctions was denied.
Civil Rule 26(g) requires an attorney to respond to a discovery request after making "reasonable inquiry," and to certify that the response is: (1) consistent with the rules, (2) not interposed for any improper purpose, and (3) not unreasonable or unduly burdensome or expensive. This Court has held that if a certification is made in violation of the rule, sanctions are mandated. Wash. State Physicians Ins. Exch. & Ass'n v. Fisons *404 Corp., 122 Wash.2d 299, 355, 858 P.2d 1054 (1993).
In the case before us, the record reflects that Gonzaga responded to John Doe's interrogatory without making reasonable inquiry. It was unreasonable for Gonzaga's counsel not to ask his clients if Gonzaga personnel had, in fact, prepared a chronology of events. Gonzaga's representation that it would be unduly burdensome or unreasonable to provide a chronology was misleading in that it served to deflect a motion to compel a response to the interrogatory. Gonzaga's response was inconsistent with the spirit and intent of the rules. For these reasons, the Court of Appeals properly found that the trial court abused its discretion in failing to impose CR 26(g) sanctions against Gonzaga.
We affirm the Court of Appeals' order that the trial court impose an appropriate sanction against Gonzaga for violation of CR 26(g) on remand.

CONCLUSION
The Court of Appeals' decision is reversed and the judgment is reinstated on the jury verdict as to John Doe's claims for defamation, invasion of privacy, violation of his rights under FERPA, and breach of contract.
The Court of Appeals' rulings dismissing John Doe's negligence claim and remanding to the trial court for imposition of an appropriate sanction against Gonzaga for violation of CR 26(g) are affirmed.
The trial court's supplemental judgment for attorney fees and costs is reinstated, and John Doe is awarded reasonable attorney fees and expenses on appeal pursuant to RAP 18.1.
ALEXANDER, C.J., SMITH, JOHNSON, SANDERS, BRIDGE, CHAMBERS and OWENS, JJ., and BROWN, J.P.T., concur.
NOTES
[1] Although the real names of the plaintiff and his sexual partner appear in the trial transcript, the plaintiff filed suit as "John Doe" and is so denominated here. As in the Court of Appeals' decision, John Doe's partner is identified as "Jane Doe."
[2] Trial testimony showed that the investigation eventually included the following Gonzaga personnel: Julia Lynch, Chris Earnest, Roberta League, Susan Kyle, Janet Burcalow, Corrine McGuigan, Jon Sunderland, John Balog, Colleen Farrell, Sue Weitz, Kermit Rudolf, Father Coughlin, Vicki Loveland, Maureen Sheridan, William Sweeney, Vicki Howard, Cheryl Lepper, Tim McLaughlin, and Leo Driscoll.
[3] Applicants for certification are required to demonstrate their character and fitness for teaching, including a questionnaire, a fingerprint check, and an affidavit from the dean of the college or the school of education. The dean is to certify under penalty of perjury as follows:

I swear (or affirm) that several faculty members have been contacted who personally know or knew _________, who is a candidate for certification. They have no knowledge and I have no knowledge that the applicant has been convicted of any crime or has a history of any serious behavioral problems.
Br. of Appellants at 5.
[4] At trial, Nurse Vicki Olson (Olson) testified that she did not perform a physical examination of Jane Doe. She recorded Jane Doe's subjective symptoms and scheduled an appointment for her with Dr. Nancy Crotty (Crotty). When Olson asked Jane Doe if she wanted to report a rape, Jane Doe said no. Crotty testified that when she examined Jane Doe the following day, her findings were consistent with intercourse. Crotty testified that Jane Doe did not accuse John Doe of date rape or sexual assault. Crotty suggested that Jane Doe seek counseling if she felt that she had been unwillingly involved in intercourse. John Doe testified that Jane Doe told him the nurse or doctor had said the intercourse appeared forced. When John Doe asked Jane Doe, "Well, was it?", she responded, "I don't know. Was it?" Report of Proceedings (RP) at 366, 536.
[5] Lynch testified at trial that the conduct Jane Doe had described to her was normal, nonaberrant sexual activity. Lynch, League, and Kyle could not say at the time of trial what they discussed that led to references in the Kyle and League declarations to seamy and deviant activities and sexual penetration with foreign objects. Kyle admitted that she may have misunderstood, and that Lynch may only have spoken of John Doe's wanting to date two women simultaneouslynot of proposing ménage à trois. The women's conversation included discussion of whether there were erotic pictures in his room, whether John Doe was circumcised, and how often he changed his condoms.
[6] Sweeney prepared a written declaration in which he stated that Jane Doe told him John Doe had "physically forced her, as well as verbally threatened her, to have both vaginal as well as anal intercourse." Clerk's Papers (CP) at 202. When questioned about the statement at trial, Sweeney testified that "[t]he `anal' should have been `oral' and I made a mistake in that." RP at 1389.
[7] McGuigan testified at trial that "it's easy for people's reputation to be slandered, specially in the case of a teacher if it is sexual misconduct that is alleged." RP at 1495.
[8] As a threshold matter, Gonzaga moves to strike John Doe's reply to Gonzaga's answer to the petition for review. A party may not reply to an answer unless the answer raises a new issue. RAP 13.4(d). In its answer, Gonzaga presented arguments as to why review should be denied. However, Gonzaga did not request that this Court address additional issues. Therefore, Gonzaga's motion to strike is granted.
[9] At the time of the events in question, WAC 180-75 (1989) detailed the application process for teacher certification. The chapter was repealed in 1997 and was reenacted as a part of WAC 180-79A and 180-86.
[10] The statute defines "education records" as "those records, files, documents, and other materials which ... contain information directly related to a student; and ... are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

When a student has reached 18 years of age, or is attending an institution of post-secondary education, required consent and rights accorded to the student's parents are to be accorded to the student. 20 U.S.C. § 1232g(d).
[11] The cases include Wright v. City of Roanoke Redev. & Hous. Auth., 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (Brooke Amendment); Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (Boren Amendment); Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (Adoption Assistance and Child Welfare Act of 1980); and Blessing v. Freestone, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (Title IV-D of the Social Security Act).
[12] Falvo v. Owasso Indep. Sch. Dist. No. I 011, 233 F.3d 1203 (10th Cir.2000); Brown v. City of Oneonta Police Dep't, 106 F.3d 1125 (2d Cir. 1997); Lewin v. Med. Coll. of Hampton Roads, 931 F.Supp. 443 (E.D.Va.1996), aff'd, 131 F.3d 135 (4th Cir.1997); Tarka v. Cunningham, 917 F.2d 890 (5th Cir.1990); Tarka v. Franklin, 891 F.2d 102 (5th Cir.1989).